IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RICHARD K. and W.K.,<br><br>      Plaintiffs,<br><br>v.<br><br>BLUECROSS BLUESHIELD OF ILLINOIS and THE BOEING CONSOLIDATED HEALTH AND WELFARE BENEFIT PLAN (PLAN 635),<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO DISMISS**<br><br>Case No. 2:23-cv-491-TC<br><br>Judge Tena Campbell |

On July 28, 2023, Plaintiffs Richard K. and W.K. filed their Complaint against BlueCross BlueShield of Illinois (BCBSIL) and the Boeing Company Consolidated Health and Welfare Benefit Plan (Plan 635) (the Plan) asserting two claims: 1) a claim for recovery of benefits under a plan governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA), see 29 U.S.C. § 1132(a)(1)(B); and 2) a claim for equitable relief based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 (the Parity Act), see 29 U.S.C. § 1132(a)(3). (Compl., ECF No. 1 at ¶¶ 48–81.) Currently at issue before the court is the Defendants' Motion to Dismiss. (ECF No. 13.) For the reasons stated below, the court denies that motion.

## BACKROUND

According to the allegations in the Complaint, W.K. received medical care and treatment at Evoke at Entrada (Evoke) from March 29 to July 6, 2021, and at Vista Adolescent Treatment

1

Center (Vista) from July 7, 2021, to April 11, 2022.  (Compl. ¶ 4.)  Evoke is a Utah-licensed outdoor behavioral health facility and Vista is a Utah-licensed residential treatment center.  (Id. ¶¶ 4, 14, 32.)  Both provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.  (Id. ¶ 4.)

Richard K. is a participant in the Plan, which is a self-funded employee welfare benefit plan under ERISA.  (Id. ¶ 3.)  As the child of Richard K., W.K. is a beneficiary under the Plan and was a beneficiary under the Plan during the period when W.K. was receiving care at Evoke and Vista.  (Id. ¶¶ 1, 3.)  BCBSIL is an independent licensee of the nationwide BlueCross and BlueShield network of providers and was the third-party claims administrator for the Plan—and a fiduciary under ERISA—during the treatment at issue.  (Id. ¶ 2.)

On February 1, 2022, BCBSIL sent an Explanation of Benefits statement denying payment for W.K.'s treatment at Evoke, which read: "This service is excluded under your Health Care Plan.  Please refer to your benefit booklet for specific coverage information and exclusions under your contract." (Id. ¶ 11.)  Richard K. filed a Level I appeal of that decision on July 26, 2022.  (Id. ¶ 12.)  In his appeal, Richard K. argued that Evoke met the definition of a "provider" under the Plan and that the Plan's exclusion of coverage for "wilderness programs" was a limitation that only applied to mental health services and excluded from coverage treatment that would otherwise be a covered benefit under the Plan.  (Id. ¶¶ 14, 18.)  Richard K. also asked for a copy of all documents under which the Plan was operated, as well as any internal notes and reports related to the decision to deny payment.  (Id. ¶¶ 13, 23.)  BCBSIL denied that appeal in a letter dated August 25, 2022, which stated:

> The member submitted an appeal disputing the denial of their [child's] claim for wilderness therapy.  The member believes this service should be covered.  After a review of the submitted information and the member's benefit book, we have determined the denial is correct.  The member's benefit book stipulates all

benefits available to the member.  There is a specific exclusion for this service. We regret that our determination could not be more favorable.

(Id. ¶ 24.)  In a letter dated August 30, 2022, BCBSIL provided some but not all of the documents that Richard K. had requested.  (Id. ¶ 25.)

When W.K. was admitted to Vista, the facility attempted to obtain preauthorization from BCBSIL but was told that preauthorization would be denied because BCBSIL required residential treatment centers to provide 24-hour nursing care, which Vista did not do.  (Id. ¶ 28.) BCBSIL later sent Richard K. an Explanation of Benefits statement, which read: "Coverage for this service has been denied because the provider was not eligible to bill this type of service according to the provider's credentials, or the service was not within the scope of the provider's practice under the provider's license or applicable medical standards or guidelines."  (Id. ¶ 29.) Richard K. filed a Level I appeal of that decision on November 3, 2022.  (Id. ¶ 27.)  He argued that Vista was a licensed residential treatment center that was operated in compliance with governing state regulations and the terms of the Plan.  (Id. ¶ 32.)  He also asked for a copy of the Plan documents.  (Id. ¶ 31.)  BCBSIL denied that appeal in a letter dated December 2, 2022, which stated: "The facility is a licensed residential treatment facility.  However, the facility does not meet our standards of a residential treatment facility because there is no doctor or medical staff in house 24 hours a day, seven days a week."  (Id. ¶ 33.)

Richard K. submitted a Level II appeal on January 3, 2023.  (Id. ¶ 35.)  He maintained that BCBSIL had not cited any provision in the Plan that required a licensed residential treatment facility to have a doctor or medical staff onsite at all hours.  (Id.)  BCBSIL denied that appeal in a letter dated January 30, 2023.  (Id. ¶ 41.)

3

**LEGAL STANDARD**

To survive a motion to dismiss, the factual allegations in a complaint must raise a plausible right to relief.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–56 (2007).  A claim is facially plausible when the plaintiff pleads enough factual content to justify the reasonable inference the defendant is liable for the misconduct alleged.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  And while factual allegations asserted in a complaint are accepted as true for purposes of a motion to dismiss, conclusory allegations in a complaint are not entitled to such deference and are insufficient to state a claim.  Id.

**ANALYSIS**

The Defendants argue that the court should deny the Plaintiffs' claim for benefits for W.K.'s treatment at Evoke as untimely, that the Plaintiffs lack standing to pursue their Parity Act claims, and that, in any event, the Plaintiffs have failed to state a Parity Act claim for the denial of coverage at both Evoke and Vista.  The court addresses each argument in turn.

I.      **The Plaintiffs' Benefits Claim for Treatment at Evoke Is Timely**

The Plan contains the following time limits for bringing an action under ERISA:

> If the service representative denies your appeal, you may bring a civil action under Section 502(a) of ERISA, or pursue additional appeals, if applicable, including an external review under the circumstances described above.  However, except as otherwise provided in an insured contract and below, no legal action may be brought after 180 days following the decision on appeal of your claim (or 180 days following the expiration of the time to take an appeal if no appeal is taken).

(Plan, ECF No. 13-1 at 39.[1])

As detailed above, Richard K. filed a Level I appeal of BCBSIL's decision to deny coverage for W.K.'s care at Evoke.  On August 25, 2022, BCBSIL denied that appeal in a letter

---

[1] Citations are to PDF exhibit pages, not internal document pages.

that informed the Plaintiffs they had the right to a "second internal appeal" that was due "within 180 days of the date of this letter (with time allowed for mail delivery)" and cautioned: "If your request is not received within the time frame, your right to a review ends."  (Evoke Denial Letter, ECF No. 14-2 at 4–5.)  Separately, in a three-page section titled "Important Information," the letter stated: "If you receive your benefits through an employer, you may also have the right to bring an action under Section 502(a) of a law called ERISA."  (Id. at 7.)  The denial letter did not indicate the time limitations contained in the Plan relating to a beneficiary's right to file suit under ERISA.

The Plaintiffs did not file a Level II appeal.  Instead, they filed this action on July 28, 2023, which was more than 180 days after BCBSIL denied the Plaintiffs' Level I appeal.  The Defendants now argue that the court should dismiss the Plaintiffs' benefits claim for W.K.'s treatment at Evoke as untimely.

Before considering the issue of timeliness, the court first addresses whether the Plaintiffs were required to pursue a Level II appeal before filing a civil action.  This question arose during the hearing on the motion, and the court ordered supplemental briefing.  (See Min. Entry, June 6, 2024, ECF No. 20.)  The Plan states: "You may not bring legal action for benefits under this Plan unless and until you exhaust the claims and appeals procedures described in 'Claims and Appeals.'"  (Plan, ECF No. 13-1 at 39.)  But the Plan does not require a claimant to pursue more than one level of appeal.  Indeed, the Plan does not provide any certainty about the number of appeals that may be available to a claimant, but merely explains that any notice sent to a claimant when a medical benefit appeal is denied will include a "[d]escription of your right to request additional appeals, if applicable, including an external review of your appeal denial under certain circumstances described below, or to bring legal action."  (Id. at 38 (emphasis added).)  The Plan

5

states explicitly that any additional appeals are voluntary: "If the service representative denies your appeal, you may bring a civil action under Section 502(a) of ERISA, or pursue additional appeals, if applicable, including an external review under the circumstances described above." (Id. at 39 (emphasis added).)  Given these representations, the court finds that the Plaintiffs appropriately exhausted the claims and appeals procedures under the Plan before filing suit.

Having clarified that there is no bar to the Plaintiffs' claims due to a failure to exhaust (an argument the court understood the Defendants to have made during the hearing), the court notes that the argument raised by the Defendants in their supplemental briefing is distinct.  Rather than suggesting that the Plaintiffs are barred from suit because they "failed to exhaust their internal appeals," the Defendants instead maintain that they were not required to provide the Plaintiffs with specific notice about the time limitations for bringing an ERISA action in their letter denying the Plaintiffs' Level I appeal.  (See Defs.' Suppl. Br., ECF No. 21 at 2.)  Essentially, the Defendants maintain that because the Plaintiffs chose not to file a Level II appeal, the Plaintiffs never received a final denial letter highlighting the Plan's time limitations for filing a civil action.

"Because ERISA does not specify a limitations period for filing suit," ERISA plans may contain a "contractual limitations period, which is enforceable as long as it is reasonable."  Weiss v. Banner Health, 846 F. App'x 636, 639 (10th Cir. 2021) (citing Heimeshoff v. Hartford Life & Acc. Ins. Co., 571 U.S. 99, 102 (2013)).  Regulations promulgated by the Department of Labor require "any adverse benefit determination" made by a plan administrator to include "[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review."  29 C.F.R. § 2560.503-1(g)(1)(iv).

Citing a decision from the District of Utah, the Defendants argue that only "final denial letters must provide notice of contractual limitations provisions in order to later enforce such limitations in court."  E.F. v. United Healthcare Ins. Co., No. 2:21-cv-190-JNP-BDP, 2022 WL 957200, at *5 (D. Utah Mar. 30, 2022) (emphasis added).  But this argument distorts the court's holding and ignores the plain language of the regulation, which refers to "any adverse benefit determination."  29 C.F.R. § 2560.503-1(g)(1)(iv).  In E.F., the court specifically mentioned final denial letters because the case involved a final denial letter, but the court was unambiguous in holding "that the regulation requires the plan administrator to disclose the plan's applicable time limits for legal action in any denial letter."  2022 WL 957200, at *4 (emphasis added).

Multiple courts in this district have reached the same conclusion.  See, e.g., William G. v. United Healthcare, No. 1:15-cv-144-DN, 2017 WL 2414607, at *6 (D. Utah June 2, 2017) ("Subsection (g)(1)(iv) applies to any adverse benefit determination—including final denial letters."); John H. v. United Healthcare, No. 1:16-cv-110-TC, ECF No. 26, at 14–15 (D. Utah Apr. 26, 2017) (noting that Subsection (g)(1)(iv) applies to "any adverse benefit determination" and holding that final denial letters were an adverse benefit determination, but not suggesting that only final denial letters could be considered an adverse benefit determination).  Several circuit courts have held "that a plain reading of section (g) indicates that 'any adverse benefit determination,' which includes final denial letters, must include a notice of the plan's limitations provision."  E.F., 2022 WL 957200, at *3 (citing Santana-Diaz v. Metro. Life Ins. Co., 816 F.3d 172, 180 (1st Cir. 2016); Mirza v. Ins. Adm'r of Am., Inc., 800 F.3d 129, 136 (3d Cir. 2015); Moyer v. Metro. Life Ins. Co., 762 F.3d 503, 505 (6th Cir. 2015)).

The court finds no suggestion in these cases or in the language of the regulation that a denial letter may omit notice of a plan's limitations provision where a plan beneficiary may seek

another level of internal review—especially where that additional appeal is optional.  After all, "[d]isclosure ensures claimants have the information they need to pursue their claims, while placing a minimal burden on administrators."  E.F., 2022 WL 957200, at *4.  Without highlighting the time limitations that are specific to a plan, and which may be hidden in lengthy plan documents, claimants may not realize that such a limitation exists.  See Mirza, 800 F.3d at 135 ("Which is a claimant more likely to read—a ninety-one page description of the entire plan or a five-page letter that just denied thousands of dollars in requested benefits?").

Here, the reference in BCBSIL's denial letter to the 180-day limit for filing a second internal appeal did not separately mention the 180-day limit for filing an ERISA action and is insufficient to comply with the notification requirements of Subsection (g)(1)(iv).  The court therefore strikes the 180-day limitations period as unenforceable.  See E.F., 2022 WL 957200, at *6.  Because no contractual time limit applies, the court considers "the most closely analogous statute of limitations under state law."  Salisbury v. Hartford Life & Accident Ins. Co., 583 F.3d 1245, 1247 (10th Cir. 2009) (citation omitted).  In Utah, the most analogous statute of limitations for an ERISA plan is the six-year time limit for a breach of contract action.  See Michael C.D. v. United Healthcare, No. 2:15-cv-306-DAK, 2016 WL 2888984, at *2 (D. Utah May 17, 2016) (citing Utah Code Ann. § 78B-2-309(2)).  The Plaintiffs filed this action on July 28, 2023, well within six years after BCBSIL denied the Plaintiffs' appeal.[2]

---

[2] Indeed, the Plaintiffs filed their action within 360 days of when their appeal was denied.  The court is therefore unsure whether the action was even untimely under the Plan, which requires a claimant to bring an action within "180 days following the decision on appeal of your claim (or 180 days following the expiration of the time to take an appeal is no appeal is taken)."  (ECF No. 13-1 at 39.)  Because BCBSIL allowed the Plaintiffs a second appeal, it is arguable that the Plaintiffs had until 180 days after the time to take the second appeal expired (i.e., 360 days).  The Plaintiffs did not raise this argument, and the court's holding on the proper interpretation of Subsection (g)(1)(iv) renders the point moot.  But the court finds that the language is ambiguous and notes that it is especially important for plan administrators to provide claimants with clear

## II.    The Plaintiffs Have Standing to Bring Their Parity Act Claims

The Defendants assert that the Plaintiffs lack standing to bring claims under the Parity Act because they do not allege that W.K. will require future residential treatment.  But this argument misunderstands the purpose of the Parity Act, which allows the court to fashion equitable relief—including by removing requirements in the Plan that violate the Parity Act and remanding a review of the Plaintiffs' claim for benefits to the insurer.

The Defendants also maintain that the court should dismiss the Plaintiffs' Parity Act claims because the Plaintiffs ask for the same relief under their benefits claim—in other words, to be reimbursed for W.K.'s treatment at Evoke and Vista.  In Varity Corporation v. Howe, 516 U.S. 489 (1996), the Supreme Court was unpersuaded that permitting simultaneous claims under both 29 U.S.C. § 1132(a)(1)(B) (a benefits claim) and 29 U.S.C. § 1132(a)(3) (a Parity Act claim) would allow lawyers to dress up an ordinary benefits claim as a claim for breach of fiduciary duty as a way to avoid the "arbitrary and capricious" standard of review applicable to a benefits determination.  Id. at 514–15.  The Court reassured that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be appropriate."  Id. at 515 (citation modified).  Similarly, in CIGNA Corporation v. Amara, 563 U.S. 421 (2011), the Supreme Court permitted plaintiffs to pursue claims under both §§ 1132(a)(1)(B) and (a)(3), noting that the district court could appropriately determine if reformation, estoppel, or surcharge were appropriate remedies under § 1132(a)(3) in the event that remedies under § 1132(a)(1)(B) were unavailable.  Id. at 444–45.  Accordingly, Varity and Amara establish a "general remedy

instructions about time limitations where the Plan language concerning those limitations is unclear.

preference for awarding adequate monetary relief under [§ 1132](a)(1)(B) rather than equitable relief under [§ 1132](a)(3)," but "do not establish a categorial rule prohibiting [p]laintiffs from pleading two different <u>causes of action</u>" under these provisions. <u>Christine S. v. Blue Cross Blue Shield of N.M.</u>, 428 F. Supp. 3d 1209, 1222 (D. Utah 2019).

Essentially, the Defendants argue that the Parity Act claims are unnecessary if the court awards relief on the Plaintiffs' benefits claim, and unnecessary if the court denies the Plaintiffs' benefits claim, as the Plaintiffs would no longer have standing to assert a claim for equitable relief. This argument renders the Parity Act meaningless and neglects to consider that courts often remand benefits determinations for further review—sometimes after amending a plan or interpreting provisions of a plan to avoid violations of the Parity Act. The Parity Act claim here would allow the court to consider whether certain conditions of the Plan (such as the total exclusion for wilderness programs) should be struck before remanding consideration of the benefits claim back to the insurer. The Parity Act claims therefore serve a distinct purpose and the court declines to dismiss these claims as duplicative.

**III.    The Plaintiffs Adequately Plead a Parity Act Claim Concerning Evoke**

Congress enacted the Parity Act in 1996 as an amendment to ERISA in an effort "to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." <u>Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.</u>, 821 F.3d 352, 356 (2d Cir. 2016) (citation omitted). Under the statute, a health plan must ensure that

> the treatment limitations applicable to such mental health or substance use
> disorder benefits are no more restrictive than the predominant treatment
> limitations applied to substantially all medical and surgical benefits covered by
> the plan (or coverage) and there are no separate treatment limitations that are
> applicable only with respect to mental health or substance use disorder benefits.

29 U.S.C. § 1185a(a)(3)(A)(ii).  In effect, the Parity Act "prevents insurance providers from writing or enforcing group health plans in a way that treats mental and medical health claims differently."  David S. v. United Healthcare Ins. Co., No. 2:18-cv-803, 2019 WL 4393341, at *3 (D. Utah Sept. 13, 2019).  The Tenth Circuit has allowed plaintiffs to bring a claim for a violation of the Parity Act under 29 U.S.C. § 1132(a)(3), which provides that a plan beneficiary may seek equitable relief in a civil action to redress ERISA violations.  See E.W. v. Health Net Life Ins. Co., 86 F.4th 1265, 1281 (10th Cir. 2023) (noting that, while the parties did not contest the viability of such a claim on appeal, the court would resolve the dispute "on the assumption that, as a categorical matter, such a claim is viable").

The Parity Act's implementing regulations prohibit unequal treatment limitations for "both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations (such as standards related to network composition), which otherwise limit the scope or duration of benefits for treatment under a plan or coverage."  29 C.F.R. § 2590.712(a).  Nonquantitative treatment limitations on mental health benefits include "[m]edical management standards … limiting or excluding benefits based on medical necessity or medical appropriateness, or based on whether the treatment is experimental or investigative" and "restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for services provided under the plan or coverage."  Id. § 2590.712(c)(4)(ii)(A), (H).

The Tenth Circuit has upheld the following test to determine whether a plaintiff has adequately stated a Parity Act violation: 1) the plaintiff must plausibly allege that the relevant group health plan is subject to the Parity Act; 2) the plaintiff must "identify a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan;" 3) the

plaintiff must "identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care" for which the plaintiff seeks benefits; and 4) the plaintiff must "plausibly allege a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog." E.W., 86 F.4th at 1283.[3]

A plaintiff may challenge treatment limitations either facially or as applied. Id. at 1284 (citing 29 C.F.R. § 2590.712(c)(4)(i)); see also Nancy S. v. Anthem Blue Cross & Blue Shield, No. 2:19-cv-231-JNP, 2020 WL 2736023, at *3 ("[P]laintiffs often must plead 'as-applied challenges to enforce their Parity Act rights when a disparity in benefits criteria occurs in application rather than in the plan terms.'"). While facial challenges focus on the terms of a plan, "as-applied challenges focus on treatment limitations that a plan applies 'in operation.'" E.W., 86 F.4th at 1284 (citing 29 C.F.R. § 2590.712(c)(4)(i)). In an as-applied challenge, "a plaintiff must plausibly allege that a defendant differentially applies a facially neutral plan term." Id. (citations omitted).

The parties do not dispute that the Parity Act applies to the Plan and that the Plan's exclusion of wilderness programs places a limitation on some mental health treatments. Instead, the Defendants maintain that the Plaintiffs have not demonstrated any medical/surgical care covered by the Plan that is analogous to the mental health treatment provided by a wilderness program and, in any event, that the Plan does not contain any treatment limitations for mental

---

[3] Notably, the Tenth Circuit did not specify that this test was the only appropriate standard for evaluating a Parity Act claim. See E.W., 86 F. 4th at 1282–83 (noting that the parties agreed to this test at oral argument but not discussing whether other tests that district courts had applied were inappropriate). But given the Tenth Circuit's approval, the court adopts this standard.

health benefits that are more restrictive than the Plan's treatment limitations for medical/surgical benefits.

Some courts have agreed with the Defendants on both points.[4]  For instance, courts have dismissed Parity Acts claims on the grounds that a plaintiff has failed to allege a sufficient surgical/medical analog.  See, e.g., Roy C. v. Aetna Life Ins. Co., No. 2:17-cv-1216-DB, 2018 WL 4511972, at *3 (D. Utah Sept. 20, 2018) ("Plaintiffs have failed to sufficiently identify a comparison or analogue to wilderness treatment in the medical and surgical fields of treatment.").  Other courts have dismissed similar claims where the relevant plan provides coverage for mental health treatment at residential treatment centers.  See, e.g., A.G. v. Cmty. Ins. Co., 363 F. Supp. 3d 834, 841–42 (S.D. Ohio 2019) (holding that even though "wilderness camps" were excluded from coverage, the relevant plan did not contain a discriminatory limitation "because the Plan both provides benefits for services performed at residential treatment centers for medical/surgical patients and for mental health conditions").

But the court is not persuaded by the reasoning in these cases.  First, multiple courts have recognized that wilderness programs offering mental health or substance abuse treatment are analogous to intermediate medical/surgical care facilities such as skilled nursing facilities, inpatient hospice,[5] or inpatient rehabilitation facilities.  See, e.g., Michael W. v. United Behav.

---

[4] Indeed, this court has previously dismissed a Parity Act claim premised on the exclusion of treatment for wilderness programs.  Peter M. v. Aetna Health & Life Ins. Co., 554 F. Supp. 3d 1216, 1227–28 (D. Utah 2021).  But in Peter M., the court considered the issue on a motion for summary judgment with the benefit of a full record about how the defendants applied the exclusion to both mental health treatment and medical/surgical care.  Id.  The court's previous decision is therefore of limited relevance here.

[5] The Defendants dispute whether inpatient hospice facilities are analogous to residential treatment centers or other mental health facilities.  The court does not reach that question here, as the Plaintiffs sufficiently allege that skilled nursing and rehabilitation facilities are analogs to the mental health care W.K. received at Evoke.

Health, 420 F. Supp. 3d 1207, 1238 (D. Utah 2019) (permitting analogy between an outdoor behavioral therapy program and "skilled nursing facilities, inpatient hospice care, and rehabilitation facilities"); K.H.B. v. UnitedHealthcare Ins. Co., No. 2:18-cv-795-DN, 2019 WL 4736801, at (5 (D. Utah Sept. 27, 2019) (analogizing wilderness therapy programs to "skilled nursing facilities and rehabilitation hospitals"); Johnathan Z. v. Oxford Health Plans, No. 2:18-cv-383-JNB, 2020 WL 607896, at *15 (D. Utah Feb. 7, 2020) (finding "intermediate, subacute treatment at a skilled nursing, inpatient hospice, or inpatient rehabilitation facility" sufficiently analogous to wilderness programs).

Second, the fact that a plan provides coverage for mental health services at some facilities, such as residential treatment centers, does not defeat a plaintiff's Parity Act claim where the plan limits treatments for mental health services in a dissimilar way to the limitations the plan imposes on medical/surgical services. The Parity Act is concerned about disparate limitations, not simply the availability for some mental health care. Courts have been especially skeptical of these limitations where the plan in question excludes wilderness programs as a type of behavioral health service but contains no similar exclusion for medical services. See, e.g., Candace B. v. Blue Cross, No. 2:19-cv-39-RJS, 2020 WL 1474919, at *6–7 (D. Utah Mar. 26, 2020) (finding plaintiffs stated a Parity Act claim where there was an exclusion for wilderness programs only in the sections listing exclusions related to mental health services and substance abuse treatment); C.M. v. Health Care Serv. Corp., No. 24-cv-2122, 2025 WL 933847, at * 4 (N.D. Ill. Mar. 27, 2025) (finding a plausible Parity Act violation where the plan excluded "behavioral health services provided [at] … wilderness programs" and excluded wilderness programs from the definition of residential treatment centers); Allison B. v. Bluecross Blueshield of Ill., No. 24-cv-6162, 2026 WL 497246, at *6 (N.D. Ill. Feb. 20, 2026) (finding plaintiffs stated

a Parity Act claim where the plan's definition of a residential treatment center expressly excluded wilderness programs from coverage).

But here, the Plan excludes wilderness programs under a general list of medical exclusions.  (See ECF No. 13-1 at 141–42.)  The Plan is therefore neutral on its face, as it excludes any form of wilderness program from both covered mental health services and medical/surgical care.  Even so, the court is not persuaded that this facial neutrality is sufficient to defeat the Plaintiffs' Parity Act claim at this stage of the proceedings.  Notably, courts have found that discovery is necessary to determine how a categorical exclusion for treatment at wilderness programs is applied in practice:

> [The plan administrator] contends that the appropriate comparison is not between mental health treatment in a wilderness therapy setting and medical/surgical treatment in a skilled nursing or rehabilitation hospital setting, but between whether coverage of both types of treatment would be excluded if offered in wilderness program setting.  Such a contention, however, appears to concern the process and factors by which such nonquantitative treatment limitation could even be applied both to mental health benefits and medical/surgical benefits, a contention that needs to be resolved as the case proceeds after the benefit of discovery.

Vorpahl v. Harvard Pilgrim Health Ins. Co., No. 17-cv-10844-DJC, 2018 WL 3518511, at *3 (D. Mass. July 20, 2018).  Similarly, courts have noted that a categorical exclusion for treatment at wilderness programs "is itself a form of 'process' falling within 29 C.F.R. § 2590.712(c)(4)(i) that qualifies as a discriminatory limitation."  A.Z. v. Regence Blueshield, 333 F. Supp. 3d 1069, 1082 (W.D. Wash. 2018).

The Honorable Jill N. Parrish has addressed this question at length.  Focusing on the reality of how wilderness program exclusions have been applied in practice, the court denied a motion to dismiss a Parity Act claim even though the Defendants argued that the relevant plan denied coverage for wilderness programs regardless of the type of illness:

Although facial neutrality is relevant, the disparity analysis required by the Parity Act counsels against such a simplistic view. After all, "in practice, wilderness camp exclusions have only been applied to outdoor behavioral and mental health treatment programs, and thus the effect of the limitation is that it imposes a limit on mental health treatment that does not apply to medical or surgical treatment." [Michael D. v. Anthem Health Plans of Ky., Inc., 369 F. Supp. 3d 1159, 1175 (D. Utah 2019).] And the Parity Act broadly prohibits discriminatory "processes, strategies, evidentiary standards, or other factors" just as much as it proscribes facial disparities in coverage. 29 C.F.R. § 2590.712(c)(4)(i). Therefore, the relevant comparison is "not whether benefits for wilderness therapy were available for medical patients, but whether the plan provided benefits for skilled nursing facilities and rehabilitation centers for medical patients while denying benefits for residential treatment centers offering wilderness therapy for mental health patients." [Gallagher v. Empire HealthChoice Assurance, Inc., 339 F. Supp. 3d 248, 258 (S.D.N.Y. 2018).] Plaintiffs have plausibly pleaded that, for outdoor behavior treatment programs, which in practice are only available to those seeking mental health/substance abuse care, Defendants' policy of excluding outdoor behavior therapy from coverage is because of more restrictive criteria that is not applied to analogous medical/surgical care.

Michael W., 420 F. Supp. 3d at 1238.

The court finds this reasoning persuasive, especially given that the Plan at issue here provides no details about the wilderness program exclusion. See Michael D., 369 F. Supp. 3d at 1176 (remanding to reconsider a benefits determination but noting that the exclusion of all wilderness programs without explanation was "troubling" under the Parity Act). The Plaintiffs have alleged that the letter denying benefits was similarly sparse, merely citing the Plan exclusion. In the absence of a full record, the court cannot determine why wilderness programs are excluded under the Plan—or even the standards by which the plan administrator determines that a treatment or facility should be considered a wilderness program. After all, many of the services offered at Evoke are similar to services provided by residential treatment facilities, and courts considering similar claims for treatment at Evoke have struggled to characterize the care at that facility. See, e.g., J.W. v. BlueCross BlueShield of Texas, No. 1:21-cv-21, 2022 WL 2905657, at *4 n.1 (D. Utah July 22, 2022) (observing that it was a "closer question" whether

16

Evoke, which is licensed as an "outdoor youth program," qualified as a residential treatment center under the terms of the relevant plan).

This case is therefore distinguishable from cases where courts dismissed Parity Act claims because the relevant plan provided information about why wilderness programs were excluded.  See, e.g., Alice F. v. Heath Care Serv. Corp., 367 F. Supp. 3d 817, 829 (N.D. Ill. 2019) ("The Plan in this case is distinguishable from those in cases that have found Parity Act violations.  For instance, in many of the cases finding wilderness program exclusions problematic, there was either no definition of 'wilderness program' or a broader definition than the one in this case.").  Similarly, this matter presents different facts from the facts in S.F. v. Cigna Health and Life Insurance Company, in which the court found that the plan administrator was not "denying benefits solely because the services were provided outdoors."  No. 2:23-cv-213-DAK, 2024 WL 1912359, at *7 (D. Utah May 1, 2024).  In support of that holding, the court highlighted information provided by the plan administrator that the relevant plan "would cover individual services for the treatment of a mental health condition and/or substance use disorder rendered by a licensed healthcare professional while residing at the wilderness program even though those covered services were provided in an outdoor setting."  Id.  Here, the Plaintiffs allege that W.K.'s treatment "was provided by a team of clinical professionals with appropriate certifications and professional qualifications and would not have been categorically denied if it were rendered anywhere but at an outdoor behavioral health program like Evoke."  (Compl. ¶ 68.)  Taken in the light most favorable to the Plaintiffs, the court finds that this allegation is plausible.

To the extent the Defendants maintain that the Plaintiffs' allegations are conclusory, the Plaintiffs also allege that, during the internal appeals process, Richard K. specifically asked

17

BCBSIL to perform a parity compliance analysis and to provide him with other documents relevant to the decision to deny benefits, including "any clinical guidelines or medical necessity criteria …." (Id. ¶¶ 21–23.)  But he did not receive the requested materials.  (Id. ¶ 25.)  Where there is a discrepancy of information, "courts are declining to hold plaintiffs responsible for comments and information that remain within defendants' exclusive control, especially because plaintiffs should not be punished for not offering those facts when their repeated requests to learn the same have been ignored." T.E. v. Anthem Blue Cross & Blue Shield, No. 3:22-cv-202, 2023 WL 2634059, at *6 (W.D. Ky. Mar. 24, 2023) (citation modified).

The court therefore finds that, even though the Plan is facially neutral, the Plaintiffs have sufficiently alleged an as-applied Parity Act violation based on the Plan's categorical exclusion of wilderness programs and the lack of any information about the extent of that exclusion or how the plan administrator applied the exclusion in practice.

### IV.    The Plaintiffs Adequately Plead a Parity Act Claim Concerning Vista

The Plan provides benefits for the diagnosis and treatment of mental illnesses, including inpatient benefits at the residential treatment center level of care.  Whether such coverage is available generally depends on a determination that the care was "medically necessary."  But here, the Defendants did not conduct a medical necessity review.  Rather, BCBSIL's claim evaluation focused on whether Vista offered 24-hour onsite nursing services.  In its denial letter, BCBSIL stated: "The facility is a licensed residential treatment facility.  However, the facility does not meet our standards of a residential treatment facility because there is no doctor or medical staff in house 24 hours a day, seven days a week."  (ECF No. 14-1 at 3.)

But the Plan does not contain that limitation.  Instead, the Plan states that the "program covers mental health treatment when it is medically necessary and is received … from an eligible

provider, including any licensed … [h]ospital or treatment facility (as determined by the state agency that licenses mental health and/or substance use disorder treatment facilities)."  (ECF No. 13-1 at 131.)

The Defendants point out that Utah law requires skilled nursing facilities to provide "24-hour licensed nursing services," Utah Admin. Code R432-150-4(1)(c), and (to the extent the court determines that hospice facilities are an appropriate analog) also requires inpatient hospice facilities to "provide competent hospice trained nursing staff 24 hours per day," Utah Admin. Code R432-750-22(1)-(2).  The Defendants argue that because skilled nursing facilities are appropriate medical/surgical analogs for residential treatment centers, the Plan may import similar requirements for 24-hour nursing.  But the Plan itself does not contain those requirements—it merely states that eligible providers of mental health treatment must be licensed by the appropriate state agency.  And Utah does not require that residential treatment centers have 24-hour onsite nursing care.  See Utah Admin. Code R501-19-3.

That fact distinguishes this matter from the numerous cases in this district in which the court has dismissed Parity Act claims because the relevant plan explicitly states a requirement for 24-hour nursing care at residential treatment centers.  See, e.g., M.P. v. BlueCross BlueShield of Ill., No. 2:23-cv-216-TC, 2023 WL 8481410, at *4 (D. Utah Dec. 7, 2023); D.B. v. United Healthcare Ins. Co., No. 1:21-cv-98-BSJ, 2023 WL 3766102, at *5 (D. Utah June 1, 2023).  For instance, in J.W. v. Bluecross Blueshield of Texas, the court granted the defendant's motion to dismiss a Parity Act claim even though the plan at issue imposed a 24-hour onsite nursing requirement on residential treatment centers but did not expressly impose a similar requirement on skilled nursing facilities.  2022 WL 2905657, at *5–6.  The court found that such a requirement was nevertheless present because the plan required skilled nursing facilities to be

licensed under state law or be Medicare eligible, both of which required 24-hour nursing care. Id. at 6.  Accordingly, the court found there was no "disparity with regard to the 24-hour onsite nursing services requirement between residential treatment centers and skilled nursing facilities." Id.

But J.W. is the reverse image of the present action.  In J.W., the plan was silent about requirements for skilled nursing facilities; here, the Plan is silent about the requirements for residential treatment centers.  And there may be good reasons for that silence.  As the Honorable Bruce S. Jenkins observed, it is less important that 24-hour onsite nursing care is available at a residential treatment center, where people seeking treatment are often young and mobile and have different needs than the patients at a skilled nursing facility.  D.B., 2023 WL 3766102, at *5 n.5.  Although Judge Jenkins recognized that, where a plan required 24-hour nursing at a skilled nursing facility, the plan also could require 24-hour nursing at a residential treatment facility without violating the Parity Act, he nevertheless expressed concerns about that requirement: "Allowing a benefit plan to impose a 24-hour onsite nursing requirement on a [residential treatment center] facility—a requirement not imposed by state licensing agencies or by the federal government—serves no one."  Id.

The question presented here is whether, in the absence of a requirement made explicit by the terms of the Plan, the plan administrator can nevertheless require residential treatment centers to employ 24-hour nursing staff to qualify for coverage.  The Defendants argue that there can be no Parity Act violation where the Plan's written standards for mental health treatment are less restrictive than the Plan's requirements for analogous medical/surgical care.  But even if the Plan could have imposed more restrictions on the type of residential treatment centers eligible for coverage, the court finds that the administrator's decision to impose these restrictions in addition

to the restrictions imposed by the Plan itself is the type of "process" that qualifies as a discriminatory limitation under 29 C.F.R. § 2590.712(c)(4)(i).

In other words, the Plaintiffs have plausibly alleged that the plan administrator processed claims for mental health treatment more strictly than it processed claims for analogous medical/surgical care because the administrator imposed an additional requirement that was not present under the terms of the Plan.  The Plaintiffs have therefore stated a claim for a violation of the Parity Act.

ORDER

For the foregoing reasons, the Defendants' Motion to Dismiss (ECF No. 13) is DENIED.

DATED this 31st day of March, 2026.

BY THE COURT:

Tena Campbell
United States District Judge